# MAXWELL *v.* McDONALD.

## WILLS.

1. In the construction of a will, the court will place itself as fully as possible in the situation of the person whose language it is to interpret, and, guided by the light thus thrown upon the testamentary scheme, it may find itself justified in departing from a strict construction of the testator's language, without allowing conjectural interpretation to usurp the place of judicial exposition.

2. The court's interpretation of a will will not be controlled by the statement in the bill filed by the executors for its construction, as to the interpretation desired by one of the parties interested, especially where such interpretation would be at variance with the claim of

such party in her answer to the bill, and it also appears that many parties interested are before the court only in the person of the executors.

3. By his will dated June 26, 1913, a testator bequeathed to his wife "600 shares of the stock of the Standard Oil Co. of New Jersey and a *pro rata* (600/983383) of the stocks of all the companies formerly subsidiaries of the Standard Oil Co. of New Jersey of which I am the owner at the time of my death," and also to her in trust for her son by a former husband "200 shares of the stock of the Standard Oil Co. of New Jersey and a *pro rata* (200/983383) of the stocks of all the companies formerly subsidiary to the Standard Oil Co. of New Jersey of which I am the owner of stocks at the time of my death." At the date of his death his family consisted of his wife, her son by a former husband, a married son by a former wife, and a grandson. His estate of several million dollars included 2,478 shares of the capital stock of the Standard Oil Co. of New Jersey, of which there had been issued and were outstanding 983,383 shares, and certain shares of the capital stock of former subsidiary companies. Several years previously, that company, which had held all of the stock in most of such subsidiary companies and some of the stock in others, had, as a result of legal proceedings, distributed such stock *pro rata* among its own stockholders, and thereafter from time to time the subsidiary companies had increased their capital stock and either distributed such increase among their stockholders in the form of stock dividends, or sold it to them at par in proportion to their holdings. The testator in each case of such increase acquired such part of the additional stock, either in the form of stock dividends, or by purchase at par, as his holdings entitled him to. Prior to the execution of his will the testator had sold his shares in one of the subsidiary companies and thereafter he sold certain fractional shares in another company. Except for these sales, he maintained at all times, and until his death, his ownership of 2478/983383 of the total issue of shares in the subsidiary companies. In a suit by the executors for the construction of the will, it was held, that the words "of all the companies formerly subsidiaries of the Standard Oil Co. of New Jersey," as used·in the will, were merely words of description and identification, and not words of limitation, and that the widow of the testator and his stepson were entitled to the same fixed proportions—600/983383 in the case of the widow and 200/983383 in the case of the stepson—of the shares of stock in the subsidiary companies of which the testator died possessed, as he gave them in the shares of the Standard Oil Company of New Jersey.

No. 2941. Submitted October 12, 1916. Decided November 15, 1916.

HEARING on an appeal by the defendants from a decree of the Supreme Court of the District of Columbia in a suit by executors for the construction of a will.                    *Affirmed.*

The facts are stated in the opinion.

*Mr. Frederic D. McKenney, Mr. John S. Flannery,* and *Mr. Edward C. DeWitt,* for the appellants, the executors of the will of James McDonald, in their brief cited:

*Adams* v. *Cowell,* 177 U. S. 471; *Atty. Gen.* v. *Grote,* Wigram, Wills, p. 108, Appx., 201, 202 (Lord Eldon's decision); *Barber* v. *Pittsburgh,* 166 U. S. 83, 109; 3 Burr. 1634 (Lord Mansfield's rule); *Clarke* v. *Boorman,* 18 Wall. 493; *Dandridge* v. *Washington,* 2 Pet. 369; *Doe* v. *Considine,* 6 Wall. 468; *Evans* v. *Iglehart,* 6 Gill & J. 171; *Finlay* v. *King,* 3 Pet. 345, 383; *Gibbons* v. *Mahan,* 136 U. S. 549; *Giles* v. *Little,* 104 U. S. 291; *Hardenbergh* v. *Ray,* 151 U. S. 112; *King* v. *Ackerman,* 2 Black, 408; *Lane* v. *Vick,* 3 How. 464; *Leavitt's Estate,* 148 N. Y. Supp. 758; *Robinson* v. *Adams;* 4 Dall. Appx. XII., XX.; *Smith* v. *Bell,* 6 Pet. 68, 79; *Wright* v. *Denn,* 10 Wheat. 204, 239; Hawkins, Wills, 17, 18, 300; Schouler, Wills & Administration, pp. 230, 532; Williams, Exrs. 1424, 1438.

*Mr. Frederick de C. Faust* and *Mr. Charles F. Wilson,* for the appellants James McDonald, Jr., and Beulah McDonald, his wife, in their brief cited:

*Bailey* v. *New York C. R. Co.; Baltimore & O. R. Co.* v. *Sewell,* 35 Md. 238; *Boardman* v. *Railway Co.* 84 N. Y. 178; *Brombacher* v. *Berking,* 56 N. J. Eq. 251; *Brundage* v. *Brundage,* 60 N. Y. 544; *Central R. Bank Co.* v. *Papot,* 59 Ga. 342; *Chwatal* v. *Schreiner,* 148 N. Y. 683, 690; *Ohio* v. *Cleveland, etc. R. Co.* 6 Ohio St. 489; *Currie* v. *White,* 1 Sweeney, 198; *De Gendre* v. *Kent,* L. R. 4 Eq. 283, 16 L. T. N. S. 694; *Dow* v. *Gould, etc. Min. Co.* 31 Cal. 629; *Foote, Re,* 22 Pick. 299; *Gibbons* v. *Mahon,* 136 U. S. 549; *Goodwin* v. *Hardy,* 57 Me. 143; *Hill* v. *Newichawanick Co.* 8 Hun, 459; *Howser* v. *Rich-*

ardson, 90 Mo. App. 134; *Jones* v. *Terre Haute R. Co.* 57 N. Y. 196; *Kernochan, Re,* 104 N. Y. 618; *Lambert* v. *Paine,* 5 Cranch, 131; *Leavitt, Re,* 148 N. Y. Supp. 758; *Libbey's Estate,* 37 Wash. L. Rep. 690; *Lock* v. *Venables,* 27 Beav. 602; *March* v. *Eastern R. Co.* 43 N. H. 515; *Mercer* v. *Buchanan,* 132 Fed. 505; *Norris* v. *Harrison,* 2 Madd. ch. 268; *Perry* v. *Maxwell,* 17 N. C. 495; *Phelps* v. *Farmers' Bank,* 26 Conn. 269; *Reynolds, Re,* 124 N. Y. 398; *Rogers, Matter of,* 22 App. Div. 432; *Rose* v. *Barclay,* 191 Pa. 594; *Rosenberg* v. *Frank,* 58 Cal. 387; *Soehnlein* v. *Soehnlein,* 131 N. W. 747; *Spear* v. *Hart,* 3 Robt. 420; *Spooner* v. *Phillips,* 62 Conn. 73; *Thayer* v. *Paulding,* 200 Mass. 98; *Waterman* v. *Allen,* 42 Ill. App. 294; *Webster* v. *Hale,* 8 Ves. Jr. 413; *Wheeler* v. *N. W. Sleigh Co.* 39 Fed. 347.

Mr. *Benjamin S. Minor* and Mr. *L. Randolph Mason* (Mr. *Hugh B. Rowland* and Mr. *Colley W. Bell,* being of counsel), for the appellees, in their brief cited:

*Blake* v. *Hawkins,* 98 U. S. 315–324; *Brumbacher* v. *Berking,* 56 N. J. Eq. 253; *Cruit* v. *Owen,* 25 App. D. C. 519; 32 Cyc. 685; *Douglass* v. *Douglass,* 13 App. D. C. 27; *Fox* v. *Phelps,* 17 N. Y. 394; *Gold* v. *Judson,* 21 Conn. 622; *Hager* v. *McDonald,* 65 Fed. 202; *Home Ins. Co.* v. *Cont. Ins. Co.* 188 N. Y. 389; *Re Leavitt,* 148 N. Y. Supp. 758; 1 Jarman, Wills, 326, and 428; 81 L. J. Ch. N. S. 20; *Montgomery* v. *Brown,* 25 App. D. C. 494; *Osborn* v. *Osborn,* 24 Gratt. 392; *Patch* v. *White,* 117 U. S. 210; *Porter's Estate,* 77 Pa. 48; *Re Clifford; Mallam* v. *McFie,* 106 L. T. N. S. 14; *Rosenberg* v. *Frank,* 58 Cal. 404; Schouler, Wills, 2d ed. 517; *State* v. *Hamilton,* 69 Miss. 116; *State* v. *B. & P. Exp. Co.* 100 Me. 278; *Turner* v. *Leaning,* 106 L. T. N. S. 793.

Mr. Justice Robb delivered the opinion of the Court:

This is an appeal from a decree in the supreme court of the District. The hearing was before the late Mr. Justice Anderson,

whose comprehensive and carefully prepared opinion we adopt and here reproduce:

"On the 26th day of June, 1913, the testator, James Mc-Donald, executed in his own handwriting, in London, England, his last will and testament. On April 14, 1914, he executed in the city of New York a codicil thereto. He died January 13, 1915.

"On June 12, 1915, the testator's executors, Lawrence Maxwell, of Cincinnati, Ohio, and the Fulton Trust Company of New York, filed their bill in this court, asking for the construction of two items of the will, *viz.,* items G and H, and likewise the instruction of the court as to certain minor matters.

"By item G of his will, the testator makes provision for his widow, Charlotte Jane Isabelle McDonald, as follows:

" '(G) I bequeath to my wife Charlotte Jane Isabelle—if she survives me six hundred shares (600) of the stock of the Standard Oil Co. of New Jersey and a *pro rata* (600/983383) of the stocks of all the companies formerly subsidiaries of the said Standard Oil Co. of New Jersey stocks of which I am the owner at the time of my death. This is in addition to the one hundred and fifty thousand dollars ($150,000) due to her from me under our antenuptial agreement.'

"By item H, the testator provides for his stepson, Arthur B. Campbell, who is the son of the testator's widow by a former marriage, as follows:

" '(H) I bequeath to my wife—Charlotte Jane Isabelle—in trust for her son Arthur B. Campbell two hundred (200) shares of the stock of the Standard Oil Co. of New Jersey and a *pro rata* (200/983383) of the stocks of all the companies formerly subsidiary to the said Standard Oil Co. of New Jersey of which I am the owner of stocks at the time of my death. She may pay over to him any part or all of both interest and principal as she may deem desirable—until he reaches the age of thirty years when she must pay over to him the entire amount then remaining in the fund.'

"Under these two items of the will, there is submitted for the construction and decision of the court, in effect, a single and dis-

tinct question touching the nature and effect of the bequests therein provided. It will be observed that, by item G, the testator, after bequeathing to his surviving wife 'six hundred shares (600) of the stock of the Standard Oil Co. of New Jersey,' makes further provision for her in the following language 'and a *pro rata* (600/983383) of the stocks of all the companies formerly subsidiaries of the said Standard Oil Co. of New Jersey stocks of which I am the owner at the time of my death.' And by item H, after bequeathing to his wife Charlotte Jane Isabelle McDonald, in trust for her son Arthur B. Campbell, 'two hundred (200) shares of the stock of the Standard Oil Co. of New Jersey,' he makes further provision for him in the following language, which is identical with that of item G, barring the use of the figure '200' in item H instead of the figure '600' in item G, and also except for the slight transposition of the word 'stocks' where it last appears in the first sentence of each item, which transposition in nowise affects the natural and necessary meaning of the clause, viz., 'and a *pro rata* (200/983383) of the stocks of all the companies formerly subsidiary to the said Standard Oil Co. of New Jersey of which I am the owner of stocks at the time of my death.'

"The question arising under each of these clauses of the will is the same, viz., What interest in, or what proportion of, the stocks in these subsidiary companies do these beneficiaries take thereunder?

"The answer to this question depends upon the sense in which the testator used the words 'pro rata' as applied to these subsidiary stocks. And, in arriving at the sense in which he used them, it is important to understand the state of facts under which he made his will.

" 'An investigation of such facts often materially aids in elucidating the scheme of disposition which occupied the mind of the testator. To this end, it is obviously essential that the judicial expositor should place himself as fully as possible in the situation of the person whose language he has to interpret, and guided by the light thus thrown upon the testamentary scheme, he may find himself justified in departing from a strict

construction of the testator's language, without allowing conjec-
tural interpretation to usurp the place of judicial exposition.'
1 Jarman, Wills, 428.

"Among the facts and circumstances present to the mind of
the testator at the time he wrote and executed his will in London
June 26, 1913, and to be considered by the court in interpret-
ing the language he thus employed in making these bequests,
were:

"1. The members and situation of his family, viz., His wife,
to whom he had been married ten years, and her son, Arthur B.
Campbell (by a previous marriage), and his own son (by a
previous marriage), James McDonald, Jr., then residing in the
United States, and his own grandson James McDonald 3d, the
only child (at that time) of James McDonald, Jr., and wife
Beulah McDonald (the three of whom were living together).

"2. The amount and character of his estate, then approximat-
ing from $3,500,000 to $4,000,000, including 2,478 shares of
the capital stock of the Standard Oil Company of New Jersey,
and in addition thereto such proportion of the capital stock of
the companies formerly subsidiaries of the Standard Oil Com-
pany of New Jersey as his said holding of 2,478 shares bore to
the total number of outstanding shares of stock of the said
Standard Oil Company of New Jersey. On or about December
1, 1911, and for some time prior to that date the Standard Oil
Company of New Jersey had outstanding 983,383 shares, of its
authorized capital stock of one million shares, of the par value
of $100 per share. For some time prior to November 20, 1909,
the Standard Oil Company of New Jersey owned all the stock
of thirty-three other corporations, known as 'subsidiary com-
panies.' It follows, therefore, that, since the testator was the
owner of 2,478 shares out of the total number of outstanding
shares of 983,383, of the Standard Oil Company of New Jer-
sey, his interest in the assets and property of the Standard Oil
Company of New Jersey, including its holdings in these various
subsidiary corporations on and prior to December 1, 1911, was
2478/983383 thereof.

"Under a bill in equity theretofore filed by the United States

in the circuit court of the United States for the eastern district
of Missouri, against the Standard Oil Company of New Jersey,
and others, including said subsidiary companies, to enjoin the
continuance of an alleged illegal combination in violation
of the Sherman Anti-trust Act of July 2, 1890, it was
held, on or about November 20, 1909, that the stocks of these
subsidiary companies were acquired and held by the Standard
Oil Company of New Jersey by virtue of an illegal combination,
and a decree was entered enjoining the continuance thereof, the
decree providing, however, for distribution to the shareholders
in the Standard Oil Company of New Jersey of a *pro rata* of
the shares of stock in the subsidiary companies. Pursuant to
that decree, the Standard Oil Company of New Jersey there-
after, on or about December 1, 1911, ratably distributed to its
shareholders all the stocks owned by it in these subsidiary com-
panies. At that time, there were outstanding, as already stated,
983,383 shares of stock of the Standard Oil Company of New
Jersey. Each of the shareholders in said company was, there-
fore, entitled to receive, and did receive, for each share of his
stock in said company, a 1/983383 part of the stocks owned by
the company in all of its formerly subsidiary companies.

"So that, being at that time (December, 1911) the owner of
2,478 shares of the capital stock of the Standard Oil Company
of New Jersey, the testator was entitled to receive, and did re-
ceive, a 2478/983383 part of all the stocks owned by the Stand-
ard Oil Company of New Jersey in said subsidiary companies.

"The testator's ownership of said 2,478 shares of the capital
stock of the Standard Oil Company of New Jersey continued
unchanged up to the time of his death. His ownership of
2478/983383 of the total stocks in each of said subsidiary com-
panies also continued unchanged up to the time of his death,
except as to his stocks in the Waters-Pierce Oil Company (one
of said subsidiary companies) which he sold February 10, 1913,
and as to his fractional shares in the other subsidiary companies
which he sold August 22, 1913. Between the date of the afore-
said distribution in December, 1911, and the date of the execu-
tion of the testator's will, and likewise between the date of the

execution of his will and the date of his death, a number of the former subsidiary companies increased their capital stock, the increase being distributed to the stock holders, in the form of stock dividends in some instances and by sale through subscription rights at par in others, in the proportion that their respective holdings bore to the total holdings. The testator in each case of such increase acquired such part of the additional stock, either by purchase at par or in the form of stock dividends, to which his holdings entitled him. He thereby maintained at all times his ownership of 2478/983383 of the total stocks in each of said former subsidiary companies, with the exception of the stock of the Waters-Pierce Oil Company, which he sold prior to the execution of his will, and the fractional parts of shares of stock in the other subsidiary companies which he sold in August, 1913, subsequently to the date of his will.

"Having now considered the facts and circumstances present to mind of the testator at the time of making his will, it will be proper to consider and answer the question here involved as to the meaning of the words *'pro rata'* in the connection in which the same are used in items G and H of the will.

"It is plain that the testator intended to bequeath, and did bequeath, under item G of his will 600 shares of the capital stock of the Standard Oil Company of New Jersey (or 600/983383 of the total stock in that company), and under item H of his will 200 shares of the capital stock of the Standard Oil Company of New Jersey (or 200/983383 of the total stock in that company).

"In bequeathing a *'pro rata'* (meaning the same fixed proportion) 600/983383 for his wife, and 200/983383 for his stepson, of the stocks of all the companies formerly subsidiaries of the Standard Oil Company of New Jersey, is it not clear that the testator intended to give the same fixed proportion of the total interest in the subsidiary companies that he gave in the Standard Oil Company of New Jersey? Is it reasonable to suppose that the testator, in using the words *'pro rata'* as applied to the stocks in these subsidiary companies, intended to give to his wife on the one hand, and to his stepson on the other, not

the same fixed proportion that he provided for them in the Standard Oil Company of New Jersey, but only a mere infinitesimal 600/983383 and 200/983383 of the testator's holdings in the subsidiary companies as distinguished from such fixed proportions of the total holdings in the subsidiary companies? In the opinion of the court, it is not reasonable to so suppose. The testator did not follow the words *'pro rata'* by the further words 'of my stocks,' as he would have done had he intended the *pro rata* or fixed proportion to be limited to such part of his stocks in the subsidiary companies as the fractions used might indicate. He was careful to follow the words *'pro rata'* by the further words 'of the stocks of all the companies,' etc. The use by him of the succeeding clauses 'stocks of which I am the owner at the time of my death' in item G, and 'of which I am the owner of stocks at the time of my death' in item H, merely show that he had in mind, when executing his will, that he had already sold all of the stocks received by him in the distribution of 1911 in the Waters-Pierce Oil Company, and that he might possibly sell his stocks in other of said subsidiary companies. As already stated, he had not then sold the fractional parts of shares in the other subsidiary companies. He had, however, full knowledge at that time that a number of said former subsidiary companies had, through stock dividends and subscription at par, distributed in the same proportion as the original holdings, increased the number of their shares of stock, and that others of said companies were likely thereafter to do so. He also had full knowledge that in all such cases, while the evidence of ownership of testator's interest in the particular subsidiary company was changed, the proportion of his interest in the particular subsidiary company and in the total capital stock thereof remained the same. It seems to the court that it was the evident purpose of the testator that his wife and stepson should benefit in the increased capital stock in the subsidiary companies in the proportion in which they were interested, respectively, in the original issue; in other words, that out of the stocks in the subsidiary companies left by him at his death, his wife and stepson were to have, respectively, in each subsi-

diary company in which he then owned stock (but not in any subsidiary company in which he had sold his stock) the same fixed proportion of the then total capital stock of such subsidiary company as he gave in the Standard Oil Company of New Jersey under the items of the will in question. The shares of the subsidiary companies were of the essence of the original shares of the parent company, and a part of it, and evidently were so considered by the testator when he made his will; and when he gave an interest of the fixed proportion stated, he meant to give the same interest in the subsidiary companies that he gave in the parent company, to the same extent as if the subsidiary companies had not been separated from the parent company. Had there been no separation of the subsidiary companies from the Standard Oil Company of New Jersey, the gift of 600 shares to the wife, and 200 shares for the stepson, of the Standard Oil Company of New Jersey, would necessarily have carried therewith precisely and exactly that which this court finds the testator intended to give under items G and H of his will. The question is, not what will the law give as an incident to a bequest, but rather, what did the testator himself give as his bequest. This view is supported in *Re Leavitt,* 86 Misc. 609, 148 N. Y. Supp. 758: 'The shares of the subsidiary companies were of the essence of the original shares; they were part of them. They should therefore go to the legatees to whom the original thirty shares were bequeathed.'

"On behalf of defendants James McDonald, Jr., and Beulah McDonald, it has been argued that the bequests of stocks in the subsidiary companies are limited to a *pro rata* of the stocks therein outstanding in December, 1911. To sustain such contention would appear to necessitate reading into the will a limitation which the testator neither expressed nor intended; because, had he so intended, it is fair to assume he would have expressed it, particularly in view of his own knowledge that the total stocks in a number of the companies had increased between December, 1911, and the making of his will, without increasing or diminishing his *pro rata* interest. Nor is the court able to agree with the further contention on behalf of defendants James

McDonald, Jr., and Beulah McDonald that the court's interpretation of items G and H of the will ought to be controlled by the statement in the bill as to the construction desired by Charlotte Jane Isabelle McDonald. Such statement of her desire is at variance with her own statement thereof embodied in her answer filed herein, and it must be manifest that she could in no event be bound by statements of others made in a bill filed against her. Moreover, in interpreting this will for the benefit of all parties interested, a large number of whom are only before the court in the persons of the executors, the court cannot rest its conclusions as to the meaning of the disputed provisions upon the interpretation or concession of any one of the parties."

Upon the handing down of the foregoing opinion, counsel directed the attention of the learned trial justice to the fact that, although the Standard Oil Company of New Jersey, at the time of its dissolution, did hold all the stock in most of the thirty-three subsidiary companies, it did not hold all the stock in all such companies. The court ruled that this made no difference in the interpretation of the will. The correctness of this conclusion is apparent. The court had found that at the time of the dissolution the testator, who owned 2,478 shares of the capital stock of the Standard Oil Company, "was entitled to receive, and did receive, a 2478/983383 part of all the stocks owned by the Standard Oil Company of New Jersey *in said subsidiary companies.*" In other words, whether the Standard Oil Company owned all or a part of the stock in any given subsidiary company, each Standard Oil shareholder would be entitled to a *pro rata* interest in such stock.

We concur in the view that the words, "of all the companies formerly subsidiaries of said Standard Oil Company of New Jersey," as used in the will, are merely words of description and identification, and not, as earnestly contended by appellants, words of limitation. Realizing that he might be the owner of stock in companies other than those formerly subsidiary to the Standard Oil Company, or that he might dispose of stock in such companies, he bequeathed a *pro rata*

(600/983383) of all the stocks of which he should be the owner *at the time of his death* in the companies subsidiary to the Standard Oil Company at the time of its dissolution. It is conceded that the stocks here involved were stocks in the companies described in the will, and that they were owned by the testator at the time of his death. It necessarily follows, we think, that they passed under the provisions of the will.

The decree must be affirmed, with cost.          *Affirmed.*